# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JAMES DONALD VANCALLIS,

        Defendant-Appellant.

UNPUBLISHED
January 9, 2018

No. 332514
Macomb Circuit Court
LC No. 2014-004654-FC

Before: STEPHENS, P.J., and CAVANAUGH and K. F. KELLY, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions for first-degree premeditated murder, MCL 750.316(1)(a), first-degree felony murder, MCL 750.316(1)(b), kidnapping for purpose of engaging in criminal sexual penetration, MCL 750.349(1)(c), and assault with intent to commit criminal sexual penetration, MCL 750.520g(1). Defendant was sentenced to life without parole for the murder convictions, 225 months to 480 months for the kidnapping conviction, and 80 months to 120 months for the assault conviction. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

The 14-year-old victim, April Millsap (April), was murdered along the Macomb Orchard Trail on July 24, 2014 sometime between 6:30 p.m. and 8:00 p.m. At approximately 5:30 p.m. that day, she left to take her dog, Penny, on a walk. April's mother, Jennifer Millsap, became concerned after April failed to return by 8:00 p.m. because April was usually only gone for about an hour. Several texts and phone calls to April's phone went unanswered. Jennifer contacted April's boyfriend, Austin Albertson. Austin was very worried because April had texted him "I almost got kidnapped, OMFG." Jennifer, Austin, and Austin's friend, Alex, began to look for April.

The trail was eight feet wide with asphalt. There was a gully or ditch on the one side that was fairly steep – approximately three or four feet down. It goes up again and the surface at that point is flat but covered in very thick brush and a lot of small trees. That is where April's body was found. Her blouse and bra were pulled down about her waist area and her blue shorts and undergarments were pulled down around her ankles. Her feet were bare and there were two white shoes to the north of the body. There were injuries to her neck and chin with pattern marks from footwear. There was some leaf material clutched in April's hand. There was blood on her

-1-

face and hair. The manner of death was homicide and the cause of death was "blunt head trauma and asphyxia due to neck compression." April's herringbone-pattern injuries were consistent with a shoe tread, indicating that someone had stood on her neck. The medical examiner testified that the attack on April may have lasted over ten minutes.

Police started their investigation by looking at April's family and loved ones. Security video eliminated April's boyfriend Austin and his friend Alex. Given the gravity of the case, several groups were involved, including: The Violent Crimes Task Force, the Homicide Task Force, the Southeastern Michigan Crimes Against Children Group, the Michigan State Police (MSP), the FBI, and the Macomb County Sheriff's Office. Because there was a lot of publicity about the case, a tip line was established to receive tips from the general public. A number of tips came in from people who thought they saw April on the trail with a man who was on a motorcycle. Several eyewitnesses testified at trial, placing April and defendant on the trail together near the time of her death.

The jury was shown an animation created by FBI special agent Matthew Zentz. Zentz used information from April's phone and entered it into Google Earth to re-create the path the phone took just prior to and after April's death. During that time, April's phone placed three calls and sent one text message. The animation included pinpoints for the times of the phone calls and text messages, as well as the location of the body. At 6:28 p.m., the phone texted - "I was almost kidnapped. OMFG." The phone then attempted three calls to 810-882-2469 at 6:31 p.m., 6:32 p.m., and 6:33 p.m. At approximately 6:44 p.m., the phone departed the area where April was found. Whereas the phone had previously traveled an average of approximately 3.8 miles per hour, the phone suddenly traveled at 22 miles per hour.

A police officer observed a motorcycle in a driveway that appeared to match the description of the motorcycle seen on the trail and in a neighbor's security camera footage. The officer eventually made contact with defendant at a home that defendant shared with numerous family members and his girlfriend, Krystal Stadler. Defendant originally told the officer that he left his house around 5:00 p.m. to visit his brother and left his brother's house before dark because he was worried about hitting a deer. He reported that he wore a black helmet, a Carhartt hoodie, camouflage pants, and K-Swiss tennis shoes. Defendant provided roughly the same information the following day.

There was no physical evidence linking defendant to April's murder. The evidence against him consisted of eyewitnesses who placed defendant with April on the trail just before the murder as well as Krystal's testimony that defendant behaved strangely the night of the murder. Krystal testified that on the day of the murder defendant left the house on his motorcycle around "four thirty, five" to go to his brother Donnie's house to take his brother a "toothbrush thing" and pick up some money. Defendant was wearing a white t-shirt with football logos on it, gray camo pants, his favorite Jordans, and a backpack. He also owned a Carhartt hoodie. Defendant returned around "eight thirty, nine," just before it started to get dark. Krystal woke up to find defendant cleaning his shoes in the middle of the night. This seemed unusual as she had never seen him clean his shoes before. Defendant explained that he was cleaning off some oil. He used hand sanitizer and a sock. Defendant came back to bed and told Krystal that "he messed up and he needed me to stand by his side." His demeanor was "lovey dovey," which indicated to Krystal that "he did something wrong."

Police interviewed Krystal on a number of occasions and she admitted to giving inconsistent statements. Krystal eventually told police about defendant's statement during a third interview. Krystal admitted that the nine years she and defendant were together were not necessarily harmonious. In fact, during that time Krystal had an affair with a 17-year-old and had a child by him. Krystal and defendant had only recently gotten back together in May 2014, just weeks before the murder.

Police officer seized defendant's helmet and a variety of other items for testing. They also seized a password-protected computer from defendant's room that included prior searches such as, "why would this girl say I'm too old for her and still hit on me?" and "how to get a girl that does not like you to like you." Officers also found images of defendant wearing the Jordans on social media. Because the shoes Krystal described were never found, officers purchased a similar pair and had them analyzed to see whether they matched the tread found on April's body. There was a "limited association" noted.

Defendant did not testify and did not present any witnesses. Instead, defense counsel vigorously and effectively cross-examined the prosecution's witnesses and argued that defendant was not April's killer. The jury disagreed and found defendant guilty of first-degree premeditated murder, first-degree felony murder, kidnapping for purpose of engaging in criminal sexual penetration, and assault with intent to commit criminal sexual penetration. He was sentenced as outlined above.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied his right to the effective assistance of counsel where his attorney failed to challenge the admissibility of a computer-generated animation, failed to object to the police chief's vouching for the credibility of eyewitness testimony, failed to offer an eyewitness identification expert, and failed to object to the prosecutor's misconduct during closing argument. "[A] defendant must move in the trial court for a new trial or an evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Defendant has done neither; therefore, the Court's review is limited to mistakes apparent on the record. *Heft*, 299 Mich App at 80.

"To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. In order to demonstrate that counsel's performance was deficient, the defendant must show that it fell below an objective standard of reasonableness under prevailing professional norms." *People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003), citing *Strickland v Washington,* 466 US 668, 687; 104 S Ct 2052; 80 L Ed2d 674 (1984); *People v Pickens,* 446 Mich 298, 302-303; 521 NW2d 797 (1994). In so doing, the defendant must overcome the presumption that the challenged action was sound trial strategy. *Riley*, 468 Mich at 140. "A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments." *People v Grant*, 470 Mich 477, 486–87; 684 NW2d 686 (2004).

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v Washington,* 466 US 668, 689; 104 S Ct 2052; 80 L Ed2d 674 (1984). For that reason, "[w]e will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *People v Unger*, 278 Mich App 210, 242-243; 253; 749 NW2d 272 (2008).

In order to show prejudice, a defendant must show that but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. *People v Trakhtenberg*, 493 Mich 38, 51–52; 826 NW2d 136 (2012).

## A. FAILURE TO OBJECT TO COMPUTER-GENERATED ANIMATION

At trial, FBI special agent Matthew Zentz testified that he had been a special agent with the FBI for 16 years. He was a digital forensic examiner who examined computers and cellphones. Zentz was part of the computer analysis response team (CART) for the past 10 years. It took him two years to become certified. He also had annual proficiency tests. When the prosecutor asked that the trial court qualify Zentz as a witness, defense counsel responded "[w]e have no objection. As long as he sticks to the field of digital forensics."

Zentz testified that CART became involved in the case in September 2014 to analyze April's phone. CART used forensic tools to focus on July 24, 2014, sorting the files by date (Tr II, p 21). Zentz was particularly interested in a screenshot that was taken by the operating system of the phone itself. It was unusual for a user to take that type of screenshot, so CART looked deeper into it. In so doing, Zentz saw another screenshot of what appeared to be an image of a global position satellite (GPS) that was generated by a fitness application (app) that appeared to be running during the time April was killed. The fitness app was used for people to keep track of their workouts, keeping track of location, time, and speed.

Zentz was unable to directly read the data files because they were in the proprietary format of the company that created the app. Zentz discovered that the sports tracker app was developed by a company out of Finland and that CART needed the company's help in reading the files. Zentz sent the encrypted data files to the company and the company sent back a text file containing 3,000 data points for latitude, longitude, date, time and speed. Zentz used that information to create an animation in Google Earth to re-create the phone's path in the time leading up and directly after April's murder. Zentz denied putting in any of his own information. The animation included pinpoints for the three phone calls directly before April's murder, text messages and the location of the body.

Zentz and the team then bought an iPhone to test the data files. The team made a copy of the data files and loaded them on the test iPhone along with the fitness app. They loaded the app and then copied the data files from April's phone to put them in the same file location. This second piece of forensic work indicated that the paths were identical and corroborated what the company had provided.

The animation was admitted without objection and played for the jury.

During cross-examination, defense counsel confirmed that the animation was something that Zentz created. Zentz did not personally travel to Finland, nor did he speak to anyone in

person. Instead, Zentz spoke with the company's CEO over the phone. Zentz had no knowledge regarding the CEO's technical experience. Zentz did not inquire into the reliability or the validity of the information. The conversation was exclusively about gaining access to the software. Zentz did not ask for any reliability studies or the error rate associated with the data. He acknowledged that this was something created at law enforcement's request and that it was only as good as the data and information provided by the company. If any of that information was wrong, then the animation would be off. Still, Zentz made no inquiries into the reliability or validity of the information.

On appeal, defendant argues that defense counsel was ineffective for failing to object to the animation on hearsay grounds. However, a decision not to object to evidence can be sound trial strategy. *Unger*, 278 Mich App at 242, 253. Without a *Ginther*[1] hearing, we are left to guess what defense counsel's strategy was in failing to object to the animation. However, the record reveals that defense counsel raised concerns regarding the computer-generated animation. Defense counsel received funds to obtain an expert on cellular phones. This expert sat with defense counsel during Zentz's testimony and assisted counsel in cross-examination. In the end, counsel requested that the jury consider the computer-generated animation to support his theory, asking the jury to pay special attention to the timing of the events. It is important to note that, on appeal, defendant has framed the issue as one of ineffective assistance of counsel and *not* as a claim of evidentiary error. Defense counsel's approach in obtaining his own expert to examine the underlying data and provide assistance during questioning of witnesses was sound trial strategy. Moreover, because the animation was not inadmissible hearsay, defense counsel was not ineffective for failing to advance a meritless position. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.")

The animation was used as demonstrative evidence. "Demonstrative evidence is admissible when it aids the fact-finder in reaching a conclusion on a matter that is material to the case." *People v Bulmer,* 256 Mich App 33, 35; 662 NW2d 117 (2003). Such evidence must be both relevant and probative. *Id.* Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Demonstrative evidence "is used only as a non-verbal mode of expressing a witness's testimony and as a testimonial aid it may often help the jury to understand the evidence more clearly than they could from the words of any witness." *Finch v WR Roach Co*, 295 Mich 589, 595; 295 NW 324 (1940) (quotation marks and citations omitted). The demonstrative aid "must be sponsored by a witness who uses it to relate his personal knowledge or scientific skill and understanding." *Id*. The law requires that '[t]he facts or data . . . upon which an expert bases an opinion or inference shall be in evidence.' "*Unger*, 278 Mich App at 248, quoting MRE 703. "An expert witness's opinion is objectionable if it is based on assumptions that do not accord with the established facts." *Id*. at 248.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

"[W]hen evidence is offered not in an effort to recreate an event, but as an aid to illustrate an expert's testimony regarding issues related to the event, there need not be an exact replication of the circumstances of the event." *Id.* " 'Beyond general principles of admissibility, the case law of this state has established no specific criteria for reviewing the propriety of a trial court's decision to admit demonstrative evidence.' " *Id*. at 247, quoting *People v Castillo,* 230 Mich App 442, 444; 584 NW2d 606 (1998). The evidence "must satisfy traditional requirements for relevance and probative value in light of policy considerations for advancing the administration of justice." *Unger*, 278 Mich App at 247.

Zentz created the animation to support his testimony and was properly admitted as demonstrative evidence. Even if the animation is considered a hearsay statement under MRE 801(a) and (c), the animation satisfies a record exception under MRE 803(6), which provides:

> (6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with a rule promulgated by the supreme court or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Jussi Kaasinen of Sports Tracking Technologies, Ltd. authenticated the data compilation when he signed the "Records of Regularly Conducted Business Activity" for purposes of the Uniform Unsworn Foreign Declarations Act, MCL 600.2181. The data that was provided was made by a person with knowledge of the matter, made at or near the time of the occurrence. Sports Tracking Technologies, Inc. made, kept and maintained the data in the ordinary course of regularly conducted business activity. We reject defendant's claim that the animation was testimonial in nature when Zentz, who created the animation from the underlying data, testified at trial.

Nor is there any support for defendant's argument that counsel was ineffective for failing to insist on a *Daubert*[2]hearing to determine whether Zentz was qualified to offer the animation and determine whether it was the product of reliable principles and methods. MRE 702 "requires trial judges to act as gatekeepers who must exclude unreliable expert testimony." *Lenawee Co v Wagley*, 301 Mich App 134, 162; 836 NW2d 193 (2013). The purpose of a *Daubert* hearing is to filter out unreliable expert evidence. *Id*. "The gatekeeping inquiry is context-specific and must be tied to the factors of a particular case." *Id*. at 163 (internal quotation marks and citation omitted). Zentz had an extensive history as a digital forensic examiner. Defense counsel was

---

[2] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579 (1993).

not ineffective for demanding a *Daubert* hearing for the limited purpose of exploring Zentz's qualifications in creating the animation, especially where counsel vigorously cross-examined Zentz and utilized an expert to critically examine Zentz's findings.

## B. FAILURE TO OBJECT TO TESTIMONY REGARDING EYEWITNESS CREDIBILITY

Defendant argues that counsel was ineffective in failing to object to Armada Police Chief Howard Smith's testimony that eyewitness accounts are credible and correct the majority of time. Defendant maintains that such testimony "trampled on the province of the jury" to determine witness credibility. Again, a decision not to object to evidence can be sound trial strategy. *Unger*, 278 Mich at 242, 253.

Defendant's appellate brief fails to show the context in which the testimony took place. The prosecutor had been questioning Smith about how the case was investigated. Specifically, Smith testified that a tip line was created and every tip was pursued. The testimony that defendant finds offensive was included in this lengthy exchange:

> *Q.* [by the prosecutor] Were eyewitnesses developed as a result of the investigation?
>
> *A.* They were.
>
> *Q.* How did their information come into the task force?
>
> *A.* Voluntarily. They came in, they identified, you know, in particular three of them had been on the, on the trail the day of the event. One was an eyewitness. Mr. Reschke has already testified. One was an eyewitness to April. Two were eyewitnesses that said that they saw somebody on a blue and white motorcycle. And then there were two other people that saw something in the little clearing by the Liberty Trail that they thought were suspicious. They came forward as well.
>
> *Q.* You're an officer of many years, we've spent time questioning the jurors during voir dire about eyewitness testimony and their opinion and credibility. In your experience as an officer, the eyewitness testimony that you're receiving here, how do you, *what do you do to verify or do whatever you can to be certain that it has some credibility*?
>
> *A.* Through my experience, my training, through different detective bureau courses that I took when I was in the detective bureau and that one of the things that you look at with eyewitness testimony is the credibility, the daylight, the time, the frequency. There is some, if there's a weapon involved there's some focus on the weapon, not necessarily on what they're seeing. And the other thing you want to do is you want to take it for what this eyewitness is telling you, if they have a particular focus on a certain thing you accept that and go with that. You then look at and go with corroboration. You know, were there other people that saw the same thing? Can you, can you corroborate what the eyewitness is

-7-

telling you? And in the most part, the most part the eyewitness is correct the majority of the time.

> *Q.* But there are times where there are issues (inaudible)?

> *A.* Absolutely.

> *Q.* It goes both ways.

> *A.* It does.

> *Q.* Do you know, do you sit, I guess as the judge of it, or do you just simply gather all of that information and continue to move the investigation forward?

> *A.* My job is to gather the information, put it all together and provide it. [Emphasis added.]

It is clear that the prosecutor asked Smith about the steps he takes to verify a tip. Smith was not asked to comment on whether eyewitness testimony was correct a majority of the time; instead, this last comment was non-responsive to the question being asked. Just as "an unresponsive, volunteered answer to a proper question is not grounds for the granting of a mistrial," *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995), counsel was not ineffective for failing to object to the challenged testimony. Defense counsel also may have reasonably determined that objecting to the testimony would have drawn unnecessary attention to it. See *People v Bahoda*, 448 Mich 261, 287 n 54; 531 NW2d 659 (1995) ("[T]here are times when it is better not to object and draw attention to an improper comment."); *People v Lawless*, 136 Mich App 628, 635; 357 NW2d 724 (1984) ("Defense counsel could properly have refrained from objecting to the brief questions where an objection could have emphasized the testimony in the minds of the jurors and where no further reference was made to the testimony.").

Defense counsel instead pursued the issue during cross-examination:

> *Q.* [by defense counsel] Okay. Now you just indicated in response to Mr. Cataldo's testimony [sic] that most of the time you find eyewitness testimony to be reliable?

> *A.* Through my training and experience, the bulk of eyewitness testimony is credible, yes.

Defense counsel then questioned Smith at length about the discrepancies in the eyewitness testimony in this case. Defense counsel's failure to object to Smith's testimony did not fall below an objective standard of reasonableness under prevailing professional norms.

### C. FAILURE TO PRESENT EYEWITNESS IDENTIFICATION EXPERT

Defendant argues that defense counsel was ineffective for failing to call an expert to testify that eyewitness testimony was unreliable. He maintains that expert testimony was the

most effective tool for protecting against eyewitness misidentification and that counsel inexplicably failed to call an expert even though funding for such an expert was approved. However, "[d]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

Although the trial court approved funds for such an expert, defense counsel did not present any evidence or witnesses. However, defense counsel did make eyewitness testimony his focus at trial. Counsel also vigorously and effectively cross-examined the eyewitnesses. Our review of the entire record reveals that defense counsel was zealous and successful in this tactic. Eyewitness testimony was clearly the focus for everyone concerned. And the trial court stressed the importance of scrutinizing such testimony when instructing the jury:

> One of the issues of this case is the identification of the Defendant as the person who committed the crime. The Prosecutor must prove beyond a reasonable doubt that the crime was committed and that the Defendant was the person who committed it. In deciding how dependable or not identification is think about such things as how good a chance the witness had to see the offender at the time, how long the witness was watching, whether the witness had seen or known the offender before, how far away the witness was, whether the area was well lighted, and the witness' state of mind at the time. Also think about the circumstances at the time of the identification, such as how much time had passed since the crime, how sure the witness was about the identification and the witness' state of mind during the identification. You may also consider any times that the witness failed to identify the Defendant or made an identification or gave a description that did not agree with his or her identification of the Defendant during trial.

> You should examine the witnesses' identification testimony carefully. You may consider whether other evidence supports the identification, however, whether it supports the identification because then it may be more reliable. However you may use the identification testimony alone to convict the Defendant as long as you believe the testimony and you find that it proves beyond a reasonable doubt that the Defendant was the person who committed the crime. [Tr X, pp 122-123.]

Again, absent a *Ginther* hearing, we are left to guess why defense counsel declined to produce an expert on eyewitness identification. But one may assume that defense counsel believed that the issue was properly explored during trial. His tactic was to show that the prosecution had not proven its case and he, therefore, declined to present any evidence or call any witnesses. Defense counsel's failure to do so did not fall below an objective standard of reasonableness under prevailing professional norms. See *People v Blevins*, 314 Mich App 339, 351; 886 NW2d 456, 463 (2016) ("Although defendant believes that additionally presenting an expert on eyewitness testimony would have been helpful, and defendant may even be right, that counsel could conceivably have done more, or that a particular trial strategy failed, does not mean counsel's performance was deficient.")

### D.  FAILURE TO OBJECT TO PROSECUTORIAL MISCONDUCT

Defendant claims that counsel was ineffective in failing to object to the prosecutor's comments during closing arguments.

### 1.  MISSTATEMENT OF LAW

Defendant argues that counsel was ineffective for failing to object to the prosecutor's misstatement of the law regarding premeditation.  A prosecutor's clear misstatement of the law, if uncorrected, can deprive a defendant of a fair trial.  *People v Grayer*, 252 Mich App 349, 357; 651 NW2d 818 (2002).

During closing arguments, the prosecutor discussed the premeditated murder instruction and its elements:

> [Element n]umber four is the one that I really want you to consider. I'll read it with you. The killing was deliberate, which means the Defendant considered the pros and the cons of the killing and thought about and chose his actions before he did it. There must have been real and substantial reflection for long enough to give a reasonable person a chance to think twice about the intent to kill. The law does not say how much time is needed. That's for you to decide. We talked about that can be as little as seconds or as long as it took to plan the 9-1-1 bombing. That's up to you to decide. We're going to talk about that three to five-minute gap, which is where the premeditation was formed in just a second.

> * * *

> Let's go back to premeditation. You saw the instruction, you get to be the determinant of the time. I would say to you the first assault on her happened at 6:26 or 6:27, before in fact she makes that text. And we know from Dr. Pietrangelo that she has bruises under her arms. We have to wonder if he had grabbed her and attempted to move her and she got away that first time and moved quickly up the path. But at 6:28 is when she makes that text and at 6:30 she's in the bushes being murdered. That three to five minutes, especially after he failed the first time to kidnap her, he formulated a new plan that included the helmet for the assault. That's the time for that premeditation.

> Now the second theory is the time theory that we talked about a little bit in jury selection. That instruction shows you if you have a chance to take a look at it, and I think of it in terms of reflection and second thought. Case law is very clear. Because this is not a gunshot or a knife wound there is time for reflection, especially in suffocation and strangulation cases where it takes minutes to die. The courts have said that you have the chance to use as premeditation the time it takes for a person to die because it gives a chance for the defendant to have second thoughts or reflections on what's happened. Dr. Pietrangelo told you that it took her approximately ten minutes to die. And can you imagine the amount of force necessary to crush a larynx and a skull and a chest? Because he let her suffocate to death. We know that that video is 14 minutes where he is in that area.

The doctor told you that it takes ten minutes to die. And we know that she was alive during part of it because of two photographs from the crime scene. While she's being stomped to death she's grabbing the leaves around her. . . .She's unable to act. That time period is premeditation because he did nothing to stop it when he could have.

The prosecutor did not misstate the law. "[T]he Legislature's use of the words 'willful,' 'deliberate,' and 'premeditated' in the first-degree murder statute indicates its intent to require as an element of that offense substantially more reflection on and comprehension of the nature of the act than the mere amount of thought necessary to form the intent to kill." *People v Plummer*, 229 Mich App 293, 301; 581 NW2d 753 (1998).

Additionally, the trial court instructed the jury: "It is my duty to instruct you on the law. You must take the law as I give it to you. If a lawyer says something different about the law, follow what I say." The trial court then instructed the jury on the elements of premeditated murder:

> Fourth, that the killing was deliberate, which means that the Defendant considered the pros and the cons of the killing and thought about and chose his actions before he did it. There must have been real and substantial reflection for long enough to give a reasonable person a chance to think twice about the intent to kill. The law does not say how much time is needed. It is for you to decide if enough time passed under the circumstances of the case. The killing cannot be the result of a sudden impulse . . . without thought or reflection.

The prosecutor's statements during closing arguments mirrored this instruction. Because there was nothing objectionable about the prosecutor's statement, defense counsel was not ineffective for failing to object. *Ericksen*, 288 Mich App at 201.

## 2. COMMENTS ON DEFENDANT'S VIOLENT NATURE

Defendant argues that counsel was ineffective for failing to object to the prosecutor's comments regarding the danger defendant posed and the need for extra security to guard against his volatility. Defendant specifically objects to the prosecutor's statement – "remember we had to remove you before we brought him out and get more security, because it's very difficult to bring somebody accused of murder that close to the jury." However, defendant takes the statement out of context. During closing arguments, the prosecutor noted:

> You have a rare opportunity in this case to see something most juries don't get to see, and that is you got to see Mr. VanCallis' volatility. Remember when Bill Buchanan was standing here and they were doing that God awful, supposed test . . .? Bill Buchanan is standing here very quiet. He's going, no, you've got to pull that helmet down, you've got to pull that helmet down, no, the helmet's too high up, you've got to pull that helmet down. And there's VanCallis I pulled it down (inaudible)!

> Put it in these terms, in front of 12 people, 14 of you now, 12 who will eventually decide his fate, in front of four armed deputies – remember we had to

-11-

remove you before we brought him out and get more security, because it's very difficult to bring somebody accused of murder that close to the jury. Four armed deputies, two more armed investigatives [sic] behind me, three cameras showing this case to the world, what does he do? He turns around and he yelled at the Judge. So you tell me what chance did April Millsap have as a small, 14 year old girl on an isolated stretch of the Orchard Trail when she rejected his advances and told him no?

The prosecutor did not mention the need for additional security to guard against defendant's volatility; instead, the prosecutor merely explained what happened during trial. He noted that defendant lost his temper, which was telling because defendant was in front of the jury and the room was full of officers. The prosecutor used defendant's behavior to demonstrate that April was defenseless against him. Because there was nothing objectionable about the prosecutor's statement, defense counsel was not ineffective for failing to object. See *Ericksen*, 288 Mich App at 201.

### 3. VOUCHING

Defendant argues that defense counsel was ineffective for failing to object to the prosecutor's vouching for the police investigation and the prosecution's witnesses. "[T]he prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness. *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659, 667 (1995). However, "although a prosecutor may not vouch for the credibility of a witness, a prosecutor may argue and make reasonable inferences from the evidence to support a witness's truthfulness." *People v Cain*, 299 Mich App 27, 36; 829 NW2d 37 (2012), vacated in part on other grounds 495 Mich 874 (2013), cert den ___ US ___; 134 S Ct 1895 (2014).

Regarding the investigation, the prosecutor's full statement was as follows:

I want to debunk a couple of myths about this case. First of all, I guess who does Mr. VanCallis think he is? Like Al Capone or John Gotti or El Chapo, that we did a backwards investigation? That we decided when we found April Millsap's body we're going to simply pin it on him? That for some, I mean Chief Smith has been there for eight and a half years, had never heard of the name James VanCallis, didn't know who he is. We worked backwards? We decided to find a pair of shoes, match those shoes, know that he had a pair of those shoes and then match those shoes to him? Find somebody in the area who owns a motorcycle and say, he, he's got a motorcycle, let's pin it on him? Really? Really? I mean what is all this? 1,000 tips, 1,000 tips! 75 investigators working full-time for weeks to find 1,000 tips. Each tip was looked at. Each tip was investigated. Each tip on here has a conclusion indicating what was done, where it was done and how it was closed out. How about the fact that Armada Village is small, so that they went to every house and every business in Armada Village and asked questions and filled out surveys, getting information? What about a rolling stop or a roadblock where they stopped hundreds and hundreds of people? There may have been tips coming in on James VanCallis at the time, and those were sent to a special unit. But they didn't avoid any other tip, they didn't stop looking.

They spent months investigating every possible clue to be certain that there were no mistakes.

There was nothing improper about the prosecutor's statement. It was responsive to defendant's implication that he was essentially framed for April's murder.

Defendant also complains about the prosecutor's claim that Krystal was credible:

> One of our other remaining witnesses is Krystal Stadler. I think it would have been real easy for Krystal to come in here and just simply say more than she did. She could have come in here (inaudible) he confessed to me. She could have come in here and said before he got rid of the shoes I saw blood. She could have come in here and said a lot of different things. She didn't. It's not her place. Everybody knows what it's like to be in the situation that she was in, those who have had or have been themselves victims of domestic violence. Krystal Stadler is a victim of domestic violence. His behavior was physically and verbally abusive she told you, and controlling. She exhibits all of the signs of a battered wife. But she is submissive, she's not vengeful. She had no attitude. She didn't come in here yelling and screaming and wanting a pound of flesh. Was she easily confused? Unfortunately she was. But I don't certainly think that she was lying when she fully understood the gravity of everything that was going on.

> \* \* \*

> She did the best she could. She told you the truth as she remembered it. And this is where your role becomes very important in this case because you are the one that judges the credibility. My Mr. Sheikh coming on and beating her up and making her confused, did that make her less than she was? Or was she just too complacent when I was asking her questions? You have to make the decision. But I would tell you based on what you saw and what she said she was as straightforward as a person that there is.

Nothing in the prosecutor's statement indicates that he asked the jury to believe Krystal because he had some special insight into her credibility. Instead, the prosecutor asked the jury to consider all of the facts and circumstances surrounding her testimony. Because there was nothing objectionable about the prosecutor's statements regarding the police investigation and the prosecution's witnesses, defense counsel was not ineffective for failing to object. See *Ericksen*, 288 Mich App at 201.

### 4. ARGUING FACTS NOT IN EVIDENCE

Defendant argues that defense counsel was ineffective for failing to object to the prosecutor's arguing facts that were not in evidence. Specifically, defendant complains that there was no evidence of "cleaning streaks" on defendant's helmet, the size of the tires on his bike, or that Krystal had the characteristics of a battered spouse. "A prosecutor may not make a statement of fact to the jury that is not supported by evidence presented at trial and may not argue the effect of testimony that was not entered into evidence." *Unger*, 278 Mich App at 241.

However, a prosecutor is "generally free to argue the evidence and all reasonable inferences from the evidence as it relates to [his] theory of the case." *Id.*

As it relates to the cleaning streaks on defendant's helmet, the prosecutor stated:

> What about the helmet? You saw the helmet. You saw the photographs of this helmet. You saw how messy that house was? OCD, my ass! Okay. I mean the only clean thing in this house was this helmet, and you saw all of the streaks on it. Because he cleaned off the DNA, cleaned off April. In fact he did such a nice job even his DNA wasn't on the helmet.

* * *

> This is the photo of the helmet as it was taken on that night. You can see it in all of its glory. The next photographs show you the helmet. Now we can see what we didn't see before, all of the cleaning streaks on it. And more important than the clean streaks, the lint still on the helmet from having been cleaned so recently.

The prosecutor did not argue facts not in evidence. Michigan State Police Officer Larissa Lamay testified:

> *Q.* [by the prosecutor] Is that the helmet closer up?
>
> *A.* Yes, it is.
>
> *Q.* Now I'm still seeing what appear to be some cardboard and some socks all around it, but this is a closer up picture of it?
>
> *A.* Correct.
>
> *Q.* Let me ask you something here. I'm going to point it out myself to ask you, this, this streaking right here in this area, did you put that on, or law enforcement put that on that day?
>
> *A.* No, sir.
>
> *Q.* I'm going to show you, this is People's Exhibit 122, do you have it? Do you recognize that as another view of the helmet?
>
> *A.* Yes.
>
> *Q.* Do you recognize that as a side view towards the back?
>
> *A.* Yes.
>
> *Q.* . . .This streaking right here on the helmet, do you recall putting that on there?
>
> *A.* No, I did not.

*Q.* Did you notice it that day?

*A.* I noticed that the helmet was clean and shiny.

\* \* \*

*Q.* Do you know, did you put these, these streak marks on here?

*A.* I did not.

Regarding the tire size, the prosecutor made the following statement during closing arguments:

> These are some of the images that we put in, we put them all on one page. This is the back camera at Mr. Koss' house, and this is a picture of the bike. What's critical about this once again you have the white here, the white here. You've got the black here with the black fender raised like that. The most important part of this is this motorcycle has two different sized tires. That's his motorcycle. What do you see here? Two different sized tires.

The tire size, as the cleaning streaks, were "in evidence" because there were photographs of each.

Defendant also takes issues with the prosecutor's characterization of Krystal as a "battered spouse." However, Krystal's testimony supported such a characterization. She testified that defendant did not allow her to have a phone or a car and that he was often physically abusive.

In addition, the trial court cautioned the jury on what was evidence at trial:

> [I]t is important for you to understand what is evidence and what is not evidence. Evidence includes only the sworn testimony of witnesses, the exhibits admitted into evidence and anything else I told you to consider as evidence.

> \* \* \*

> The lawyers' statements, arguments and commentary are not evidence. They are only meant to help you understand the evidence and each side's legal theories. You should only accept things the lawyer's [sic] say that are supported by the evidence or by your own common sense and general knowledge.

Because the prosecutor did not argue facts not in evidence, defense counsel was not ineffective for failing to object. See *Ericksen*, 288 Mich App at 201.

### 5. APPEALING TO SYMPATHY AND CIVIC DUTY

Defendant argues that counsel was ineffective for failing to object when the prosecutor encouraged the jury to convict defendant based on sympathy and civic duty. "[A] prosecutor

-15-

may not urge the jurors to convict the defendant as part of their civic duty" because such an argument "unfairly places issues into the trial that are more comprehensive than a defendant's guilt or innocence and unfairly encourages jurors not to make reasoned judgments." *People v Abraham*, 256 Mich App 265, 273; 662 NW2d 836 (2003). Nor may a prosecutor "appeal to the jury to sympathize with the deceased and [her] family." *Id.*

During closing arguments, the prosecutor stated:

Is there really a question of rape in this case? There's one and only one reason why you would leave a 14 year old girl like this. He has no reason to embarrass her. He has no personal connection with her. To embarrass somebody means to imply that you have an emotional connection. There wasn't any. They were strangers. This case was a random act, which is why the Village of Armada and all of the surrounding areas were scared to their core. Because April Millsap is somebody's daughter. She's Jennifer's daughter, but she could have been anybody's daughter that day on the trail.

The prosecutor's comment was focused on the randomness of the crime and did not ask the jury to convict out of sympathy or civic duty. Moreover, the trial court instructed the jury: "Remember that you have taken an oath to return a true and just verdict based only on the evidence and my instructions on the law. You must not let sympathy or prejudice influence your decision." Because there was nothing objectionable about the prosecutor's statement, defense counsel was not ineffective for failing to object. See *Ericksen*, 288 Mich App at 201.

## III. ADMISSION OF "GRUESOME" PHOTOGRAPHS

Defendant argues that the trial court abused its discretion by admitting gruesome photos for the jury to consider where defendant never disputed the brutality of the killing nor the cause of death. "The decision to admit or exclude photographs is within the sole discretion of the trial court." *People v Mills*, 450 Mich 61, 76; 537 NW2d 909, modified 450 Mich 1212 (1995).

"[P]hotographs are not excludable simply because a witness can orally testify about the information contained in the photographs." *Id.* at 76. Instead, "[t]he proper inquiry is always whether the probative value of the photographs is substantially outweighed by unfair prejudice." *Id.*

If photographs which disclose the gruesome aspects of an accident or a crime are not pertinent, relevant, competent, or material on any issue in the case and serve the purpose solely of inflaming the minds of the jurors and prejudicing them against the accused, they should not be admitted in evidence. However, if photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion or prejudice of the jurors. [*Id.* at 77 (quotation marks and citations omitted).]

At trial, defense counsel objected to pictures that were "cumulative" and "unfairly prejudicial." Counsel noted the fact that April "died a brutal death is not an issue. I don't know

-16-

what purpose they would serve to show all 36 [photographs]." The prosecutor responded that the photographs were his:

> attempt to illustrate through the Medical Examiner's testimony the depth, breadth, severity and nature of the injuries. If there's no stipulation in this case that this is a first degree murder, if there is we may consider accepting such a stipulation. But I have to show that this was a first degree murder, either by premeditation and deliberation, Judge, or I have to show a felony murder, which is intent to kill, do great bodily harm or create a high degree of risk of death or great bodily harm, knowing that death is a likely result, in conjunction with another felony.

The prosecutor noted that there were other more gruesome pictures that he was not electing to show the jury.

The trial court stated: "I grew up in a funeral home, 16 years. So I'm a very poor judge of what gruesome is, that's the problem. But two pictures stand out that caught me very deeply when I viewed them that I've looked at." The judge pointed to exhibits 76 and 93. In reference to 76, the trial court noted that she was "more offended by it being so close" than anything else. She pointed out that another picture (86) was similar and less gruesome. The prosecutor explained the difference between 76 and 86:

> It doesn't look as gruesome because it's not at the scene and in that picture I can indicate she's cleaned up at the Medical Examiner's Office. This is her with her hair brushed away from her face. There appears to be, I guess what you'd call a tear mark coming down her right eye. There's blood oozing from her mouth, her nose and her eye actually. You'll hear testimony that exsanguination, in other words bleeding to death was not what caused her death. But the blood oozing from her mouth and her nose and her eye is consistent with what Investigator Kusluski testified to, which may account for the small amount of blood seen at the scene.

Defense counsel nonetheless argued that it was "repetitive" and that there were "other pictures in there that show the exact same thing."

The prosecutor argued that exhibit 93 was important because:

> you see this neck injury because her head is tilted back, as well as almost an overall view of the, across her chest, the herringbone pattern of injuries. And I know the herringbone pattern of injuries is depicted in a few other photographs, but this injury right here in terms of the context of that injury to the other injuries I think is well depicted in that photograph.

The prosecutor believed both photographs were "probative, relevant and appropriate to illustrate the injuries." The trial court was somewhat hesitant, noting "I don't know how to define gruesome . . . I don't know how to put myself in the feet and the shoes of the jury in making a determination as to what may cause them to become upset." Still, the trial court acknowledged that the prosecutor had to "get across your point, and I do understand that you need to get your point across." The trial court concluded:

-17-

I'm going to allow for the pictures to be shown, however you're going to have to make sure that you give this jury a warning, indicating that they are very gruesome pictures and I don't know what their reaction is going to be. I understand what you need to do with the picture that I find distasteful, and that Number 76, and I agree that there are no other pictures that show the clarity of the blood from the mouth as well as the nose, as 76. Because she in all of the other pictures has been more or less cleaned up. I'm going to allow it.

The trial court also allowed photograph 93. "I just believe that in today's day and age this jury has probably seen more gruesome pictures in the television broadcasting of various shows. I just want them to be given the opportunity to prepare themselves."

After viewing the photos, we are convinced that their sole purpose was not to inflame the jury. Instead, the photographs were relevant to show the extent of April's injuries and identify defendant as the killer through comparable tread patterns. The photographs were also relevant to explain the absence of physical evidence at the scene. The trial court carefully considered the photos before it determined that they were relevant and not substantially more prejudicial than probative. Its decision did not fall outside the principled range of outcomes.

## IV. SUFFICIENCY OF THE EVIDENCE

In his Standard 4 Brief, defendant argues that the evidence at trial was insufficient to support his convictions. A defendant's challenge to the sufficiency of the evidence is reviewed de novo on appeal. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "In examining the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012) (quotation marks omitted).

Defendant does not dispute that each of the crimes were committed and the elements satisfied; instead, he argues that the evidence was insufficient to prove that he was the one responsible for April's death. Identity is an element of every crime. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). Like any other element of a crime, identity may be established on the basis of circumstantial evidence and reasonable inferences from the evidence. *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013). "[P]ositive identification by witnesses may be sufficient to support a conviction of a crime" and "[t]he credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). Therefore, despite inconsistencies in identification testimony, a jury is free to conclude that a witness is nonetheless credible. *People v Fletcher*, 260 Mich App 531, 561; 679 NW2d 127 (2004).

Viewed in a light most favorable to the prosecution, there was sufficient evidence to prove that defendant committed the crimes charged. Eric Reschke knew April because she was his daughter's acquaintance from church. He saw April walking her dog on the trail at approximately 6:25 p.m. Right next to April was a motorcycle. When Reschke passed by again 25 minutes later, he did not see April or the motorcycle. William Buchanan testified that he did not see April on the trail that day, but he positively identified defendant as the man he saw on the

motorcycle. Amy and Gail Spinella saw a young girl on the trail along with a man on a motorcycle. When they came through the area a few minutes later, the girl was nowhere to be seen. The dog was whimpering and Amy saw a man with piercing eyes standing nearby. She did not positively identify defendant as the man at trial nor could she exclude him. Amy helped police in compiling a composite sketch for the public. Mary Stein was convinced that defendant was the man she saw on a motorcycle that day at around 6:30. She positively identified April as the young girl walking near defendant. Mary paid particular attention because the whole situation – a motorcycle on the path, a young girl with an older man – seemed "strange." Mary had an opportunity to see defendant's features as she rode past, noting that he had an angry look on his face." Doug Stein positively identified April as the girl he saw on the trail, but could not specifically identify defendant. Still, Doug agreed with Mary that the situation was unusual. He paid particular attention to the motorcycle. The jury had an opportunity to watch an animation that showed the path and rate of travel that April's phone took. At 6:28 she texted "I was almost kidnapped. OMFG." Phone records revealed that defendant was not at his brother's house until after 7:00 p.m.

In addition to these eyewitnesses, defendant's ex-girlfriend, Krystal Stadler, testified that she woke up in the middle of the night to find defendant cleaning his shoes with a sock and hand sanitizer. He made comments to Krystal to effect that she had to "stand by his side." She could tell by his demeanor that he had done something wrong. Krystal observed defendant wearing Jordans on a daily basis. A comparable pair of Jordans were of limited association to the treads found on April's body. Krystal testified that defendant ordered her to tell police officers that he was wearing K-Swiss shoes when he left the house that evening. Defendant's computer had searches that included "how to make a girl that does not want you to want you", "why does this girl ignore me," and "why would this girl say I'm too old for her and still hit on me."

Although there was no physical evidence tying defendant to the crime, there was plenty of circumstantial evidence from which a jury could conclude that defendant was the perpetrator. Defendant complains that there was no competent evidence tying him to the crime, but it is clear that he really argues that the prosecution's witnesses were not worthy of belief and that there were simply too many inferences to support his conviction. An appellate court must "not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012). "All conflicts in the evidence must be resolved in favor of the prosecution." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). Based on reasonable inferences, there was sufficient evidence that defendant was the killer.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

-19-